In the Matter of ABRAHAM G. GERGES et al., Appellants-Respondents, v EDWARD KOCH et al., Respondents-Appellants.

Second Department, May 1, 1984

**APPEARANCES OF COUNSEL**

*Lewis, Greenwald & Kennedy, P. C.,* and *Abraham G. Gerges,* appellant-respondent *pro se* (*Thomas M. Kennedy*

and *Ira Cure* of counsel), for appellants-respondents. (One brief filed.)

*Frederick A.O. Schwarz, Jr., Corporation Counsel* (*Leonard Koerner, Jeffrey Friedlander* and *Stephen P. Kramer* of counsel), for respondents-appellants.

### OPINION OF THE COURT

*Per Curiam.*

Petitioners challenge the proposed conversion of the "brig", located at 136 Flushing Avenue, Brooklyn, across from the Brooklyn Navy Yard, into a medium security prison facility. This conversion is a crucial component of the City of New York's short-term emergency construction program to expand its jail capacity by 1,400 beds by the end of 1984. Despite the city's recent expansion of its jail capacity by more than 2,500 beds, with another 1,600 to 1,700 beds approved and in the construction pipeline, a gradual increase in annual admissions of pretrial detainees combined with a dramatic increase in the length of their stay has resulted in an average population of 7,000 detainees in 1983, compared with an average of only 4,400 six years earlier. When sentenced inmates are included, the average 1983 prison population totaled almost 10,000. Jail overcrowding has spawned a series of lawsuits, resulting in Federal court orders limiting the capacity of the city's correctional facilities and mandating the release, on or about November 1, 1983, of 613 detainees. At the present time, the inmate population is again concededly dangerously close to the mandated limits.

The city's present plan to expand its jail capacity by the most expeditious means possible includes the construction of 760 units of prefabricated modular buildings on Rikers Island and expansion of existing Rikers dormitories by 240 units, as well as the conversion of the Brig to provide 400 units by June, 1984 and another 400 by early 1985. The Brig conversion has the advantage of putting no strain on existing facilities, it being a complete self-contained facility already housing the necessary support services of intake processing, recreational and visitation areas, infirmary, kitchen and cafeteria space. Until April 25, 1984,

the Brig was used by the Immigration and Naturalization Service as a detention center for illegal aliens.

Petitioners' challenge to the Brig conversion is premised upon respondents-appellants' failure to comply with the Uniform Land Use Review Procedures (ULURP), set forth in the New York City Charter and the city Environmental Quality Review Procedures (CEQR) which parallels the State Environmental Quality Review Procedures, prior to authorizing commencement of reconstruction. The chronology of events is as follows: The Mayor of the City of New York announced the Brig conversion plan on December 9, 1983. On December 30, 1983, the Board of Estimate approved the award of construction and related contracts and exempted these contracts from public bidding requirements. On February 1, 1984, the city obtained a license from the Federal Government to renovate the Brig and house its prisoners there pending sale of the facility to the city at its assessed value. That same day, the Commissioner of Correction declared an emergency "pursuant to section 4 (h) of Executive Order No. 91, dated August 24, 1977 (The City Environmental Quality Review Procedures, 'CEQR'), and 6 NYCRR 617.2 (o) (6) of the State Environmental Quality Review Procedures", allowing the renovation to proceed prior to completion of the review process. The next day, February 2, 1984, reconstruction of the Brig's interior began. One month later, by order to show cause dated March 2, 1984, petitioners commenced the instant CPLR article 78 proceeding, inter alia, to halt construction.* Special Term rendered a decision on April 3 enjoining further construction and an order to that effect was dated April 19. In the interim, it appears that the Department of Correction filed the required project data statement and, on March 9, 1984, the city's two "lead agencies", the Departments of Environmental Protection and City Planning, which review all projects to determine whether an environmental impact statement is required, issued a "negative declaration", finding that the city's renovation and use of the Brig would not have a significant

---

* The exact nature of this suit and whether it should have been commenced as a CPLR article 78 proceeding or an action is unclear. However, inasmuch as it may be converted to its proper form under CPLR 103 (subd [c]), and we have expedited the appeal, we deal directly with the merits.

effect upon the environment. In addition, on March 5, 1984, the Department of Correction's land use review application with regard to the outright purchase of the Brig from the Federal Government was forwarded to petitioner Community Planning Board No. 2 for hearing and comment. The Planning Board has 60 days under ULURP to hold a public hearing (which we are informed is to be held shortly) and forward its comments and recommendations to the City Planning Commission.

Based upon all of the foregoing, we hold that Special Term erred in enjoining further construction pending completion of the CEQR and ULURP procedures. Pursuant to paragraph h of section 4 of CEQR, an agency may commence work on a project prior to completion of environmental review procedures where such actions are immediately necessary on a limited emergency basis for the protection or preservation of life, health, property or natural resources. The February 1, 1984 emergency declaration of the Commissioner of the Department of Correction was clearly not irrational, arbitrary or capricious, given the facts of the city's critical shortage of jail capacity and the renewed expansion of the jail population toward the mandated capacity limits. Further, as in *Matter of Board of Visitors-Marcy Psychiatric Center v Coughlin* (60 NY2d 14), where the Court of Appeals upheld the invocation of a parallel exemption (6 NYCRR 617.2 [o] [6]) for emergency actions under SEQRA for the conversion of an unused portion of a State mental institution into a State correctional facility, it is clear that the Department of Correction did not seek total exemption from all of the requirements of CEQR. This is indicated by the Department's filing of its project data statement and securing a "negative declaration" from the lead agencies.

We disagree with Special Term's interpretation of *Marcy* (*supra*) as authorizing only "cosmetic" construction prior to compliance with environmental review procedures, and, even more strongly, with its "finding" that the lead agencies' "negative declaration" is deficient. Such a "negative declaration" is not even to be found in the record herein and petitioners never formally challenged its sufficiency before Special Term. While it may then be technically true

that "[t]here is nothing in the record to indicate that respondents performed the suggested evaluation [i.e. taking a hard look at the identified relevant areas of environmental concern and making a reasoned elaboration of the basis for its determination (*Matter of Cohalan v Carey,* 88 AD2d 77, 79, app dsmd 57 NY2d 672)]", it is also true that there is nothing in the record to indicate that the respondents-appellants did not perform the proper evaluation. Moreover, the State Commissioner of Correctional Services in *Marcy (supra)*, issued a "positive declaration" as to the conversion of unused mental institution facilities into prison facilities, thus indicating that an impact on the environment was possible and that an environmental impact statement would be filed. It is in this context that the Court of Appeals emphasized that no immediate irrevocable conversion to prison facilities was to occur prior to completion of environmental review proceedings. At bar, on the other hand, the lead agencies have since issued a "negative declaration", finding no significant environmental impact in the conversion of a Federal illegal alien detention facility into a city correctional facility. We make no determination as to the reasonableness of such declaration but merely point out that negative declarations have been upheld in the past as to the conversion of a psychiatric facility to a secure juvenile facility (*Matter of Harlem Val. United Coalition v Hall,* 80 AD2d 851, affd 54 NY2d 977), of a psychiatric facility to a medium security prison (*Matter of Cohalan v Carey, supra*), and of secure juvenile and drug rehabilitation facilities to correctional facilities (*New York Moratorium on Prison Constr. v New York State Dept. of Correctional Servs.,* 91 Misc 2d 674).

Petitioners' challenge to respondents-appellants' failure to submit the Brig conversion to ULURP review prior to commencing construction is without merit. The revocable permit or license granted to the city by the Federal Government to convert and use the Brig prior to its sale is not such a "disposition of real property to the city" (NY City Charter, § 197-c, subd a, par [10]) as would trigger the ULURP procedures (*Mauldin v New York City Tr. Auth.,* 64 AD2d 114). Nor are we persuaded that section 197-c (subd a, par [5]) is applicable. In any event, the proposed

purchase of the property by the city is subject to ULURP procedures and, in compliance therewith, the city has timely submitted the land use review application to the local community Planning Board.

Finally, we note that the respondents-appellants have consented not to house any prisoners within the converted Brig for approximately one week — until May 9, 1984, to allow petitioners to take whatever further action, legal or otherwise, they deem advisable.

Accordingly, the judgment appealed from should be reversed, and the proceeding should be dismissed on the merits.

TITONE, J. P., GIBBONS, BRACKEN and BROWN, JJ., concur.

Judgment of the Supreme Court, Kings County, dated April 19, 1984, reversed, on the law, without costs or disbursements, and proceeding dismissed on the merits.